# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE LEAR CORP. ERISA LITIGATION | MASTER FILE: 5:06-CV-11735 (JCO-VMM) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

Plaintiffs Deborah Berry ("Berry"), John Blecha ("Blecha"), Michael Malloy ("Malloy"), and Boyd White ("White") (collectively, "Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of the Lear Corporation Salaried Retirement Savings Plan ("Salaried RSP"); the Lear Corporation Hourly Retirement Savings Plan ("Hourly RSP"); and the Lear Corporation Hourly 401 (k) Savings Plan ("Hourly 401(k)") (collectively the "Plans") and a class of all participants in and beneficiaries of the Plans (the "Participants").

2.     Plaintiffs seek plan-wide relief on behalf of the Plans, and concomitantly a class of all Participants for whose individual accounts the Plans purchased or held an interest in Lear Corporation ("Lear" or the "Company") securities, that have been damaged by Defendants' breaches of fiduciary duty.

3.     As more fully described below, Participants of the Plans were entitled to set aside a certain percentage of their salary and invest those funds into various investment options offered through the Plans.  One such investment option was Lear stock.

4.     Lear encouraged the Plans and their Participants to purchase and hold Lear stock. Indicative of this was the fact that up to July 14, 2005, all Company matching contributions were

made in Lear stock.    Further, until then, Participants were restricted from transferring the Company's matching contributions out of Lear stock.    Instead, Participants had to hold the Company stock acquired via the matching contribution for at least one year.

5.    As described below, during the relevant time period, Participants allocated significant amounts of their individual contributions to Lear stock and maintained their holdings in Lear stock due, in part, to Defendants' positive statements regarding Lear.

6.    As more fully set forth below, Defendants were fiduciaries who, rather than acting prudently and solely in the interest of the Plans and the Participants, failed to protect the Plans from huge losses -- even though they knew or should have known that investing in Lear stock was an imprudent investment for the Plans.

7.    Plaintiffs bring this action pursuant to Section 502 of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. §1132, against the fiduciaries of the Plans who are and were responsible for investing the Plans' assets and for administering the Plans.

8.    Defendants breached their fiduciary duties by, *inter alia*:

　　　(a)    offering Lear common stock as an investment option and permitting the Plans to buy and hold Lear shares when those shares were imprudent investments;

　　　(b)    failing to disclose information necessary for Participants to manage assets of the Plans and make informed decisions concerning the investment of their individual Plan accounts;

　　　(c)    failing to monitor the activities of those fiduciaries over whom they held appointment power; and

      (d)      failing to act with "eye single" loyalty to the Plans and their Participants, instead choosing to act in their own best interests.

9.      Since the Plans' holdings in Lear stock comprised a significant percentage of the overall value of the assets held by the Plans, the Participants' long-term retirement savings were dependent, to a substantial degree, on the performance of Lear common stock.  So too were their retirement fortunes dependent on the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of the Plans' assets.

10.      As a result of Defendants' breaches of their fiduciary duties, the Plans and the Participants have suffered substantial losses of retirement savings and anticipated retirement income from the Plans.  As such, pursuant to the mandates of ERISA, Defendants are obligated to restore to the Plans the losses that resulted from the breaches of their fiduciary duties.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and some Defendants reside or maintain their primary place of business in this district.

## THE PARTIES

**Plaintiffs**

13.     Plaintiff Deborah Berry ("Berry") was an employee of Lear and a participant in one of the Plans pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Lear stock in her retirement investment portfolio during the Class Period.  Plaintiff Berry suffered losses in her retirement account as a result of Defendants' breaches of fiduciary duty.

14.     Plaintiff John Blecha ("Blecha") was an employee of Lear and a participant in one of the Plans pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Lear stock in his retirement investment portfolio during the Class Period.  Plaintiff Blecha suffered losses in his retirement account as a result of Defendants' breaches of fiduciary duty.

15.     Plaintiff Michael Malloy ("Malloy") was an employee of Lear and a participant in one of the Plans pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Lear stock in his retirement investment portfolio during the Class Period.  Plaintiff Malloy suffered losses in his retirement account as a result of Defendants' breaches of fiduciary duty.

16.     Plaintiff Boyd White ("White") was an employee of Lear and a participant in one of the Plans pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Lear stock in his retirement investment portfolio during the Class Period.  Plaintiff White suffered losses in his retirement account as a result of Defendants' breaches of fiduciary duty.

**Defendants**

**The Company**

17.     Defendant Lear has its principal place of business at 21557 Telegraph Road, Southfield, Michigan and is one of the world's largest suppliers of automotive interior systems

and components.  Lear has more than 110,000 employees, in over 250 facilities, in 34 countries. The Company supplies automotive manufacturers with complete automotive seat systems, electrical distribution systems and various electronic products and also supplies automotive interior components and systems, including instrument panels and cockpit systems, door panels and flooring and acoustic systems.

18.     Lear is the Plan Sponsor of each Plan within the meaning of ERISA.  Lear is identified as the Plan Sponsor on the Form 5500 filed by each of the Plans with the Department of Labor ("DOL") and the Internal Revenue Service ("IRS") for the year ended December 31, 2004 (the "2004 Form 5500").  Lear is a named and/or *de facto* fiduciary of each of the Plans within the meaning of ERISA and is the Plan Administrator, as that term is defined under the statute.  Further, the Company exercises discretionary authority with respect to managing and administering the Plan and its assets.  Lear at all times acted through its Board of Directors, as well as its officers and employees including its Chief Executive Officer ("CEO"), and members of any Lear oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

19.     Lear had effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors or otherwise, Lear had the authority and discretion to hire and terminate those officers and employees.  In addition, the Board of Directors also had the authority and discretion to appoint, monitor, and remove officers and employees in their individual fiduciary roles with respect to each Plan.  By failing to properly discharge their fiduciary duties under ERISA, the officer and employee fiduciaries breached the duties they owed to each Plan and its Participants.  Accordingly, the actions of the Board of Directors, each of the Plans' committees and/or other

employee fiduciaries are imputed to Lear under the doctrine of *respondeat superior*. Lear is liable for these actions.

**Director Defendants**

20.     The Board of Directors, as the exclusive acting arm of Lear, has primary fiduciary oversight of the Plans. The Board, at all applicable times, had effective control over the activities of the members of the Employee Benefits Committee ("Benefits Committee"), who "shall serve at the pleasure of the Board of Directors." *See, e.g.,* Lear Corporation Salaried Retirement Savings Plan, Amended and Restated effective as of January 1, 1997 (November 16, 2001) § 10.2. ("Salaried RSP") (Exhibit A). Moreover, the Board of Directors appointed the members of the Benefits Committee. *Id.*

21.     The Board was a fiduciary of the Plans within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

22.     Defendant Robert E. Rossiter ("Rossiter") is the Chairman of the Board of Lear, a position he has held since January 1, 2003. Defendant Rossiter also serves as the Company's Chief Executive Officer ("CEO"), a position he has held since October 2000. According to Board Resolution, the CEO had the authority to reconstitute the membership of the Benefits Committee. *See* Board Resolution (attached hereto as Exhibit B). Defendant Rossiter was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

23.     Defendant James H. Vandenberghe ("Vandenberghe") is Vice Chairman of the Company, a position he has held since November 1998. Defendant Vandenberghe has also acted

as Chief Financial Officer ("CFO") since March 10, 2006.  Defendant Vandenberghe has been a director of Lear since 1995.  He has also served as President and Chief Operating Officer -- North American Operations (April 1997 - November 1998) and Executive Vice President (1993 to April 1997).  Defendant Vandenberghe was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

24.     Defendant Conrad L. Mallett, Jr. ("Mallett") has been a director of Lear since August 2002.  Defendant Mallett was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

25.     Defendant Anne K. Bingaman ("Bingaman") has been a member of the Company's Board of Directors since February 2004.  Defendant Bingaman was a fiduciary of each of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

26.     Defendant Janet A. Stern ("Stern") has been a member of the Company's Board of Directors since 1991.  Defendant Stern was a fiduciary of each of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

27.     Defendant Henry D.G. Wallace ("Wallace") has been a member of the Company's Board of Directors since February 2005. Defendant Wallace was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to

management and administration of the Plans and/or management and disposition of the Plans' assets.

28.     Defendant Richard F. Wallman ("Wallman") has been a member of the Company's Board of Directors since November 2003.  Defendant Wallman was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

29.     Defendant Larry W. McCurdy ("McCurdy") has been a member of the Company's Board of Directors since 1988.  Defendant McCurdy was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

30.     Defendant Roy E. Parrott ("Parrott") has been a member of the Company's Board of Directors since 1997.  Defendant Parrott was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

31.     Defendant David P. Spalding ("Spalding") has been a member of the Company's Board of Directors since 1997.  Defendant Spalding was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

32.     Defendant David E. Fry ("Fry") has been a member of the Company's Board of Directors since August 2002.  Defendant Fry was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

33.     Defendants Rossiter, Vandenberghe, Mallett, Bingaman, Stern, Wallace, Wallman, McCurdy, Parrott, Spalding, and Fry are hereafter collectively referred to as the "Director Defendants."

**Employee Benefits Committee**

34.     Defendant Employee Benefits Committee ("Benefits Committee") was a named fiduciary of the Plans. *See, e.g.,* Salaried RSP § 10.6 (attached hereto as Exhibit A). Further, the Benefits Committee had the responsibility for selecting, evaluating, monitoring and altering the makeup of the investment alternatives provided under each Plan. *Id.* § 7.1; *see also* Lear Corporation Retirement Savings Trust Salaried Plan §4.1 (noting the powers of the "Investment Committee"[1]). The Benefits Committee is a fiduciary of the Plan within the meaning of ERISA in that it exercised executive decision-making and oversight authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

35.     In 1997, the Board of Directors of Lear passed a resolution, adding the Chief Financial Officer and the Vice President of Global Compensation and Benefits, the Vice President of Human Resources, the Treasurer and the General Counsel to the membership of the Employee Benefits Committee. *See* Exhibit B.

36.     Defendant Roger Jackson ("Jackson") served as Senior Vice President – Human Resources and was a member of the Benefits Committee during the Class Period. Indeed, during at least a portion of the applicable period, Defendant Jackson served as Chairman of the Benefits

---

[1] On page nine of the Salaried Retirement Savings Plan Statement of Investment Policies and Goals, the "Investment Committee" is referred to as the Employee Benefits Committee. Upon information and belief, Plaintiff believes that they are one and the same and will use the terms interchangeably hereafter.

Committee.  Defendant Jackson was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.  Indicative of his fiduciary status, in September 2003, Defendant Jackson signed the SEC Form S-8 registering Lear stock for use in the Plans as the "Plan Administrator".

37.     Defendant Michael Miller ("Miller") served as Vice President – Global Compensation and Benefits and was a member of the Benefits Committee during the Class Period.  Defendant Miller was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

38.     Defendant Shari Burgess ("Burgess") served as Vice President – Treasury and was a member of the Benefits Committee during the Class Period.  Defendant Burgess was a fiduciary of each of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

39.     Defendant Dan Ninivaggi ("Ninivaggi") served as General Counsel and was a member of the Benefits Committee during the Class Period.  Defendant Ninivaggi was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

40.     Defendant Bill Dircks ("Dircks") served as Controller and was a member of the Benefits Committee during the Class Period.  Defendant Dircks was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to

management and administration of the Plans and/or management and disposition of the Plans' assets.

41.     Defendant David C. Wajsgras ("Wajsgras") was the Executive Vice President and Chief Financial Officer of Lear at all relevant times until he retired on March 10, 2006. Defendant Wajsgras was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

42.     Defendant Vandenberghe, as noted above, has served as the Company's CFO since March 10, 2006.  Consequently, he also served on the Benefits Committee since then as well.  Due to his service on the Benefits Committee, Defendant Vandenberghe was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

43.     Defendant William McLaughlin ("McLaughlin") was a member of the Benefits Committee for at least a portion of the Class Period.  Defendant McLaughlin was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

44.     Defendant Thomas Polera ("Polera") was a member of the Benefits Committee for at least part of the Class Period.  As such, Defendant Polera was a fiduciary of each of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

45.     Defendants   Jackson,   Miller,   Burgess,   Ninivaggi,   Dircks,   Wajsgras, Vandenberghe, McLaughlin, and Polera are herein collectively referred to as the "Benefits Committee Defendants."

46.     Unknown Fiduciary Defendants 1-10 ("Unknown Fiduciary Defendants") are residents of the United States and are or were fiduciaries of each of the Plans during the Class Period.  Plaintiffs do not yet know the identities of these Defendants but once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

47.     The Benefits Committee Defendants and Unknown Fiduciary Defendants are hereafter collectively referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure in their representative capacity on behalf of themselves and a class (the "Class") of all person similarly situated, defined as follows:

> All persons who were participants in or beneficiaries of the Plans at any time between October 21, 2004 and the present (the "Class Period") and whose accounts included investments in Lear common stock.

49.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

*Numerosity*.  The Class consists of thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

*Commonality*.  There are questions of law and fact common to the class.  Such common questions include, but are not limited to:

> (a)     Whether the Defendants are fiduciaries;

(b)   Whether the Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by causing the Plan to continue to offer Lear stock as an investment option for the Plan at a time when they knew or should have known that Lear stock was not a prudent investment for the Plan;

(c)   Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by causing the Plan to make and maintain investments in Lear stock, when it was not prudent to do so;

(d)   Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by providing incomplete and inaccurate information to participants regarding Lear stock.

(e)   Whether the Defendants breached their fiduciary obligations to provide complete and accurate information concerning the Company's financial well-being and the risk of Company stock as a retirement investment;

(f)   Whether all Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by continuing to allow Company stock as a Plan investment and by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the prudence of the Plan's investments;

(g)   Whether all Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled co-fiduciaries to commit violations of ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the breaches; and

(h)     Whether, as a result of fiduciary breaches engaged in by the Defendants, the Plan and its participants and beneficiaries suffered losses, and if so, what is the measure of damages.

*Typicality.*  Plaintiffs' claims are typical of the claims of the Class.

*Adequacy.*  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and ERISA litigation. Plaintiffs have no interests that are antagonistic to or in conflict with those of the Class.

50.     This action is maintainable as a class action pursuant to Rule 23(b) for the following independent reasons:

(a)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications which establish incompatible standards of conduct for the Defendants with respect to their obligations under the Plans; and

(b)     The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

51.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the

Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLANS

52.     At all relevant times, each Plan was an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

53.     At all relevant times, each Plan was a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

54.     In this action for breach of fiduciary duty, each Plan is neither a plaintiff nor a defendant.  Rather, Plaintiffs request relief for the benefit of the Plans and their Participants.

55.     At all relevant times, each Plan was a "defined contribution plan" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account.  Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.  Each Plan is sponsored by Lear.

56.     According to the 2004 Form 11-K Annual Report, filed by Defendants with the SEC on or about June 29, 2005 and signed by Defendant Jackson as Plan Administrator, Lear had three Plans: Salaried RSP,  Hourly RSP, Hourly 401(k).[2]

**A.    The Salaried RSP**

57.    Salaried RSP Participants may contribute between 1% and 35% of their pre-tax pay to the Salaried RSP, up to a maximum of $15,000 (for the year 2006). *See* Lear Corporation Salaried Retirement Savings Plan Summary Plan Description, last updated March 2006 ("Salaried RSP SPD") (attached hereto as Exhibit C), pp. 1, 6.

58.    The Salaried RSP "is designed to encourage savings for the long term – usually retirement." Salaried RSP SPD at 2.

59.    Active salaried employees of Lear who regularly work at least 25 hours per week and who have completed one month of service are eligible to participate in the Salaried RSP (and are automatically enrolled unless they elect otherwise). Salaried RSP SPD at 2-3.

60.    Lear matches employee contributions to the Salaried RSP, up to 5% of pay, 25% for employees with less than five years of service, and 50% for employees with five or more years of service. Salaried RSP SPD, p. 7.

61.    Company matching contributions are generally invested in the Northern Trust Money Market Fund and may be reallocated by Participants. Salaried RSP SPD, p. 9.

62.    Participants are immediately vested in their own contributions and become fully vested in their Company matching contributions after 5 years. *See* Salaried RSP SPD, pp. 12-13.

63.    The Salaried RSP purports to intend to comply with the requirements of ERISA § 404(c). Salaried RSP SPD, p. 15.

64.    The Salaried Plan offers a number of investment options, including the Lear Corporation Stock Fund. Salaried RSP SPD, p. 15.

---

[2] Plaintiffs set forth the relevant general mechanics of each plan below, but, because each plan may have resulted from the incorporation of previous plans, the discussion may omit

65.     Participants could obtain information about each investment fund from the Company. Salaried RSP SPD, p. 15.

66.     According to operative plan documents, the purpose of the Lear Corporation Stock Fund, an available option under the Salaried RSP, is to "Realize long-term growth." Salaried RSP SPD, p. 15.

67.     The Benefits Committee is charged with the responsibility for administering the Salaried RSP. "The Employee Benefits Committee shall be the 'plan administrator' of the Plan within the meaning of Section 3(16) of ERISA. Administration of the Plan, including the authority to construe, administer, and interpret the Plan and authority to direct the investment and reinvestment of the Trust Fund is the responsibility of the Benefits Committee. Lear Corporation Salaried Retirement Savings Plan, Amended and Restated effective as of January 1, 1997 (November 16, 2001) ("Salaried RSP") (attached hereto as Exhibit A), Section 10.1, p. 56. However, the authority to act for the Company with respect to the Plans was reserved "to the Board of Directors." *Id.*

68.     The Benefits Committee was also responsible for selecting investment funds for the Salaried RSP. "All contributions made to the Plan by or on behalf of a Participant shall be invested in the following Investment Funds, or such other Investment Fund or Funds *which the Employee Benefits Committee may from time to time specify*, in accordance with the provisions of Section 7.2 . . . ." Salaried RSP, Section 7.1, p. 40 (emphasis added).

69.     "The Employee Benefits Committee shall consist of not less than three persons appointed from time to time by the Board of Directors. The members of the Employee Benefits

---

provisions that are particular to individual predecessor plans.

Committee shall serve at the pleasure of the Board of Directors. . . ."  Salaried RSP, Section 10.2, p. 56.

70.    The Salaried RSP provides that "Fiduciary" under Article X of the Salaried Plan, means "the Company, the Employee Benefits Committee, and the Trustee. . . ." and sets out parameters for liability of fiduciaries for the actions of other fiduciaries.  *See* Salaried RSP, Section 10.6, p. 58.

71.    The Salaried RSP provides that the Company shall indemnify "[e]ach individual who has been designated to carry out any Fiduciary or administrative responsibility, whether an Employee, officer or director of the Company to the extent permitted by law. . . ."  Salaried RSP, Section 10.7, p. 59.

72.    The Trustee is appointed by the Employee Benefits Committee.  *See* Salaried RSP, Section 11.2, p. 60.  The Employee Benefits Committee may also remove the Trustee at any time.  *Id.*

73.    Either the Board of Directors or the Employee Benefits Committee may amend the Salaried RSP.  *See* Salaried RSP, Section 12.1, p. 61.

74.    Further, the Salaried RSP specifies that the fiduciaries have discretion to discontinue company contributions to the Plan.  "In addition to the right to amend or terminate the Plan, any Employer may at any time, by resolution of its board of directors, permanently and completely discontinue Company Matching Contributions and/or Company Primary Contributions under the Plan."  Salaried RSP, Section 12.2(d), p. 62.

75.    In August 2004, Lear published the Salaried Retirement Savings Plan Statement of Investment Policies and Goals (the "Salaried Statement"), attached hereto as Exhibit D.

76.    The Salaried Statement was "established to ensure that the [Salaried RSP] investment program will be structured in a prudent manner consistent with the objectives clearly stated in this document." Salaried Statement, p. 3.

77.    The Salaried Statement provided, *inter alia*, the stated objectives for the Salaried Plan, including to "Provide matching contributions as an incentive for employees to save for retirement" and to "Encourage participants to accumulate assets on a tax-deferred basis." Salaried Statement, p. 3.

78.    The Salaried Statement states the intent of the Company Stock Fund as follows: "The Company Stock Fund seeks long-term growth of capital through investments in the Company common stock with a small percentage of the fund's assets in cash equivalents to facilitate daily trading." Salaried Statement, p. 6.

79.    "The Employee Benefits Committee shall be responsible for "The oversight of the Portfolio and UBS Financial Services Kenwood Associates"[3], "Defining the objective and policies of the portfolio," "Directing UBS Financial Services Kenwood Associates to make changes in investment policy and to oversee and to approve or disapprove UBS Financial Services Kenwood Associates recommendations with regards to policy, guidelines, objectives and specific investments on a timely basis." Salaried Statement, p. 9.

80.    The Salaried Statement provides benchmarks for its fiduciaries to follow with respect to the analysis of investment funds in the Salaried Plan.

---

[3] Plaintiffs do not at this time have information sufficient to form a belief as to whether UBS Financial Services Kenwood Associates was a fiduciary of the Salaried RSP (and/or any other Lear defined contribution plans) at the time of the alleged fiduciary breaches. If, through discovery, Plaintiffs learn that UBS Financial Services Kenwood Associates is an appropriate defendant in this action, Plaintiffs will seek leave to add them to the complaint.

> For evaluation purposes each fund shall be analyzed in accordance
> to the Associate of Investment Management Research (AIMR)
> accepted guidelines.  Each fund will be analyzed against a universe
> comprised of funds of the same investment objective and an
> appropriate index.  **It is expected that each fund will exceed the
> median in a universe comprised of funds of the same
> investment objective.**  A performance review of each fund by
> UBS Financial Services shall be performed quarterly according to
> the following guidelines.

Statement, p.10 (emphasis added).

81.     "Company matching contributions were initially invested in the Lear Corporation

Stock Fund until July 1, 2005.  On and after July 1, 2005, Company matching contributions are

initially invested in the Northern Trust Money Market Fund and are immediately available for

transfer to any other investment fund.  Catch-up contributions are not matched."  SEC Form 11-

K, filed in 2006.

82.     The Salaried RSP was subsequently amended as follows:

> Subject to such requirements and limitations as the Employee
> Benefits Committee may from time to time prescribe or as
> provided in Section 9.3, a Participant may, as of any business day,
> elect to transfer the value of his existing Accounts among the
> Plan's Investment Funds, in multiples of 1%, in such manner as the
> Employee Benefits Committee may prescribe, except during a
> Black-Out Period.

> Unless provided in an applicable Exhibit or Appendix, prior to
> March 15, 2002, Company Matching Contributions, Company
> Primary Contributions, and Qualifies Contributions were required
> to be invested in the Lear Corporation Stock Fund, provided
> however, that any Participant who had attained age 57 was
> permitted to transfer his Company Matching Contributions,
> Company Primary Contributions, or Qualified Contributions from
> the Lear Corporation Stock Fund ....

> Unless provided in an applicable Exhibit or Appendix, effective
> March 15, 2002, all Company Matching Contributions and
> Qualified Contributions made with respect to calendar year 2002
> and all future calendar years were invested in the Lear Corporation
> Stock Fund, provided however, that as of February 1, 2003 and as

of each February 1 thereafter following the calendar year for which such Company Matching Contributions and Qualified Contributions were made, those Company Matching Contributions and Qualified Contributions could be freely reallocated by a Participant to any Investment Fund, in multiples of 1%.

Amendment to the Lear Corporation Salaried Retirement Savings Plan, effective July 1, 2005

(attached hereto as Exhibit E), Section 7.3, p. 3.

83.   The 2004 Form 11-K described the Salaried RSP as:

A defined contribution plan established to encourage and facilitate systematic savings and investment by eligible employees of Lear Corporation (the Company). The Plan includes provisions for voting shares of the Company's stock. It is subject to certain provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, applicable to defined contribution pensions plans.

**Eligibility**

All full-time, nonunion U.S. salaried employees of the Company and all full-time, nonunion Lear Technologies, L.L.C. (Lear Tech) employees who have completed one month of service and all part-time, non-union U.S. salaried employees of the Company who have completed 1,000 hours of service in one year are eligible to participate in the Plan effective the first day of the month following completion of the Plan's eligibility requirements.

**Contributions**

Participants may elect to contribute up to 25% of their annual compensation, subject to certain limitations. The Company's matching contributions are generally either 25% or 50%, up to the first 5% of compensation contributed to the Plan, subject to certain limitations, and are generally invested in the Lear Corporation Stock Fund. The matching contribution formula is based on the number of years of service of the employee. For Lear Tech employees, the Company's matching contributions are 25% up to the first 4% of compensation. In addition, Lear Tech employees receive a primary contribution based on the number of hours worked by the employee. Company matching contributions are initially invested in the Lear Corporation Stock Fund and are available for transfer to any other investment fund on February 1 following the calendar year-end.

84.    The following year's Form 11-K revealed that in 2005 certain provisions of the Salaried RSP were changed, including who was eligible to participate in the plan, the percentage of compensation that a participant could contribute, and how the Company's match was invested. According to the 2005 Form 11-K (signed by defendant Jackson):

**Eligibility**

Generally, all full-time, U.S. salaried Employees who have completed one full calendar month of service and all hourly Lear Technologies, L.L.C. ("Lear Tech") employees, whether or not they are paid on an hourly or salaried basis are eligible to participate in the Plan, effective as of the first day of any calendar month coincident with or following the date on which he or she completes one full calendar month of service, provided he or she is an eligible employee on that date.   Generally, part-time, U.S. salaried Employees who have completed 1,000 Hours of Service in the one-year period from his or her employment commencement date until the first anniversary of such date, or during any calendar year commencing thereafter, are eligible to participate in the Plan effective as of the January 1 or July 1 following the twelve-month period in which he or she completes 1,000 or more hours of service, or on the first day of any calendar month thereafter, provided that he or she is an eligible employee on that date.

**Contributions**

Participants may elect to contribute up to 35% of their compensation per pay period, subject to certain limitations. Employees who are eligible to contribute to the Plan, and who have attained age 50 before the close of the Plan year are eligible to make catch-up contributions to the Plan.  The aggregate amount of regular and catch-up deferrals may be up to 75% of Compensation per pay period.   The Company's matching contributions are generally either 25% or 50%, up to the first 5% of compensation contributed to the Plan, subject to certain limitations, and are generally invested in the Northern Trust Money Market Fund. The matching contribution formula is based on the number of years of service of the employee. For Lear Tech employees, the Company's matching contributions are 25%, up to the first 4% of compensation. In addition, Lear Tech employees receive a primary contribution based on the number of hours worked by the employee.

**B.     The Hourly RSP**

85.     The Hourly RSP is established for the benefit of Lear employees of the Marshall Plant who are subject to certain collective bargaining agreements.  *See* Lear Corporation Hourly Retirement Savings Plan Summary Plan Description for Employees of the Marshall Plant, amended as of May 1, 2003 ("Hourly RSP SPD") (attached hereto as Exhibit F), p. 1.

86.     "The Plan is administered by the Employee Benefits Committee of the Company. The Employee Benefits Committee is made up of the Senior Vice President of Human Resources, the Treasurer, the General Counsel, the Vice President of Global Compensation and Benefits, and the Controller." Hourly RSP SPD, p. 2.

87.     The Trustee of the Hourly RSP is the Northern Trust Company.  Hourly RSP SPD, p. 3.

88.     Eligible participants are automatically enrolled in the Hourly RSP when they have completed one year of service.  Hourly RSP SPD, p. 4.

89.     In 2003, Participants could contribute between 1% and 25% of their before-tax compensation to the Hourly RSP, subject to limitations imposed by the Internal Revenue Service. Hourly RSP SPD, p. 4.

90.     Participants are vested 100% in their before-tax contributions.  Hourly RSP SPD, p. 5.

91.     The Hourly RSP also provided a Company Matching Contribution during the Class Period.

> Effective January 1, 2004, the Employer will contribute to your account under the Plan a matching contribution (an "Employer Matching Contribution") equal to a 25% of your Before-tax Contributions up to 4% of your annual Compensation.  Any Employer Matching Contributions you receive will be credited to

> an account (the "Employer Matching Contribution Account")
> established on your behalf under the Plan.  You will not always be
> vested in Employer Matching Contributions made on your behalf.
> You should read the subsection entitled "Vesting in Your Account"
> on page 12 of this booklet for an explanation of vesting of your
> Employer Matching Contribution Account.

Hourly RSP SPD, p. 6-7.

92.    All contributions except for Employer Matching Contributions are allocated to the

available investment funds as determined by the participant.  Investment of Employer Matching

Contributions was explained to Participants as follows:

> If you have attained age 57, you may direct the investment of
> amounts held in your Matching Contribution Account, in whole
> percentage increments, among the various Investment Funds.  If
> you are not age 57 or older, Matching Contributions made on your
> behalf will automatically be invested in the Lear Corporation Stock
> Fund.  As of February 1, 2003, and each February 1 thereafter, you
> will be able to reallocate Matching Contributions made with
> respect to the previous calendar year from your Matching
> Contributions Account to any Investment Fund, in multiples of 1%.
> For example, on and after February 1, 2003, you will be able to
> direct the Trustee to reallocate Matching Contributions made on
> your behalf for 2002; on and after February 1, 2004, you will be
> able to direct the Trustee to reallocate Matching contributions
> made on your behalf for 2002 and 2003.

Hourly RSP SPD, p. 8.

93.    The investment funds offered in the Hourly RSP include the Lear Corporation

Stock Fund.  *See* Hourly RSP SPD, p. 10.

94.    "The Employee Benefits Committee may suspend or terminate any of the

Investment Funds, or add additional ones, at its discretion."  Hourly RSP SPD, p. 11.

95.    "The Employee Benefits Committee may establish rules for investment of your account balance, and may limit the amount of your account or incoming contributions that may be invested in the Lear Corporation Stock Fund." Hourly RSP SPD, p. 11.

96.    The investment of Company Matching Contributions was changed as follows:

> Prior to March 15, 2002, the Plan did not permit Participants to reallocate Employer Matching Contributions that were automatically invested in the Lear Corporation Stock Fund among the various Investment Funds until they reached age 57. However, since March 15, 2002, Participants have been able to direct the Trustee to reallocate the Employer Matching Contributions automatically invested in the Lear Corporation Stock Fund in calendar years 2001 and prior among the Investment Funds offered under the Plan.

Hourly RSP SPD, p. 12.

97.    Participants are immediately vested in all contributions except for Employer Matching Contributions which vest on a schedule based on years of service.  See Hourly RSP SPD, p. 12.

98.    Company Matching Contributions were further changed, as described to Participants:

> In an effort to stay current with these industry developments, changes to the RSP are being introduced. Effective July 14, 2005, all future Company matching contributions made to your RSP account will be invested on a cash basis in the Northern Trust Money Market Fund.  In addition, the restriction requiring Company matching contributions to remain invested in the Lear Stock Fund will become available for transfer to any other investment fund beginning on July 14.

> Accordingly, Company match earned during June 2005 will be credited to your account on or about July 22, invested in the Northern Trust Money Market Fund, and will be immediately available for transfer to any other investment fund.

July 13, 2005 Memorandum to Hourly Employees at certain locations (including Marshall), from Roger Jackson, Sr. Vice President, Human Resources (attached hereto as Exhibit G).

99.     In addition to the other Defendants, including Lear and the Director Defendants, the Benefits Committee is responsible for monitoring fund performance of the investment offerings under the Hourly RSP.  In their exercise of this fiduciary duty, the Committee members altered the plan makeup at least once during the Class Period, described to Plan Participants as follows.  "The Employee Benefits Committee (EBC) regularly monitors performance of the Retirement Savings Plan (RSP) investment funds.  The EBC strives to present you with a menu of funds that offer competitive performance and optimal cost structures.  Accordingly, the EBC has decided to replace the Franklin Templeton Target Allocation Funds with Dimensional Global Funds to achieve a more favorable cost structure for RSP participants."  October 21, 2005 Memorandum to All Salaried and Hourly RSP Participants, from Roger Jackson, Sr. Vice President, Human Resources (attached hereto as Exhibit H).

100.     Stated objectives of the Hourly RSP include to "Provide matching or other contributions as indicated by the participant's collective bargaining agreement as an incentive for employees to save for retirement [, and] Encourage participants to accumulate assets on a tax-deferred basis."  Lear Corporation Hourly Retirement Savings Plan, Statement of Investment Policies and Goals, August 2004 ("Hourly RSP Statement") (attached hereto as Exhibit I).

101.     The 2004 Form 11-K described the Hourly Retirement Savings Plan as:

> A defined contribution plan established to encourage and facilitate systematic savings and investment by eligible hourly employees of Lear Corporation (the Company).  The Plan includes provisions for voting shares of the Company's stock.  It is subject to certain provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, applicable to defined contribution pension plans.

**Eligibility**

Generally, all U.S. full-time, hourly employees of the Company who have completed two months to one year of service, as defined in the Plan agreement, and all U.S. part-time, hourly employees who have completed 1,000 hours of service in one calendar year are eligible to participate in the Plan.

**Contributions**

In general, participants may elect to contribute up to 25% of their annual compensation, subject to certain limitations. The Company's matching contributions are generally 25% up to the first 4% of compensation contributed to the Plan, subject to certain limitations, and are generally invested in the Lear Corporation Stock Fund. Primary contributions are based on the number of hours worked by the employee.

Company matching contributions are initially invested in the Lear Corporation Stock Fund and are available for transfer to any other investment fund on February 1 following the calendar year-end.

102.   The following year's Form 11-K revealed that in 2005 certain provisions of the Hourly Retirement Savings Plan were changed, including who was eligible to participate in the plan, the percentage of compensation that a participant could contribute, and how the Company's match was invested. According to the 2005 Form 11-K (signed by defendant Jackson):

**Eligibility**

Generally, all U.S., full-time, hourly non-bargaining employees are eligible to participate in the Plan effective as of the first day of any calendar month coincident with or following the date on which he or she completes two full calendar months of service, provided that he or she is an eligible employee on that date. Generally, all U.S., full-time, hourly bargaining employees are eligible to participate in the Plan effective as of the first day of any calendar month coincident with or following the date on which he or she completes between two full calendar months of service and a year of eligibility service (depending on the applicable collective bargaining agreement), provided that he or she is an eligible employee on that date. Generally, part-time, U.S. hourly employees who have completed 1,000 hours of service in the one-year period from his or her employment commencement date until

27

the first anniversary of such date, or during any calendar year commencing thereafter, are eligible to participate in the Plan effective as of the January 1 or July 1 following the twelve-month period in which he or she completes 1,000 or more hours of service, or on the first day of any calendar month thereafter, provided that he or she is an eligible employee on that date.

**Contributions**

In general, participants may elect to contribute up to 35% of their compensation per pay period, subject to certain limitations. Employees who are eligible to contribute to the Plan, and who have attained age 50 before the close of the Plan year are eligible to make catch-up contributions to the Plan. The aggregate amount of regular and catch-up deferrals may be up to 75% of compensation per pay period. The Company's matching contributions are generally 25%, up to the first 4% of compensation contributed to the Plan, subject to certain limitations. The amount of primary contributions vary by collective bargaining agreement and/or plan location, and are based on the number of hours worked by the employee. Catch-up contributions are not matched.

Company matching contributions were generally initially invested in the Lear Corporation Stock Fund until July 1, 2005. On and after July 1, 2005, Company matching contributions are generally initially invested in the Northern Trust Money Market Fund and are immediately available for transfer to any other investment fund.

**C.      The Hourly 401(k) Plan**

103.    The Hourly 401(k) Plan is established for hourly employees (exclusive of employees whose labor union has not signed an agreement to participate in the Hourly 401(k) Plan) of Lear's Grand Rapids and Auburn Hills, Michigan facilities. *See* Lear Corporation Hourly 401(k) Savings Plan, Amended and Restated Effective January 1, 2000, executed November, 2000 ("Hourly 401(k) Plan") (attached hereto as Exhibit J), Section 2.23, p. 7. See also Lear Corporation Hourly 401(k) Savings Plan Summary Plan Description, Updated as of March 1, 2003 ("Hourly 401(k) SPD") (attached hereto as Exhibit K), p. 1.

104.    The Benefits Committee of the Board of Directors of Lear is the named fiduciary of the Hourly 401(k) Plan.[4]  *See* Hourly 401(k) Plan, Section 2.27, p. 9, Section 9.01, p. 43.

105.    Eligible employees become Participants on the first day of the first pay period after a participant has completed 90 days of employment with Lear.  Hourly 401(k) SPD, p. 3.

106.    The Hourly 401(k) Plan includes the Lear Common Stock Fund.  *See* Hourly 401(k) Plan, Section 6.01, p. 23, Section 7.02, p. 33, Hourly 401(k) Plan, p. 9.

107.    Participants are fully vested in their accounts.  *See* Hourly 401(k) Plan, Section 6.02, p. 25.

108.    "The Company is the Plan Administrator of the Plan.  However, the Company may appoint the Employee Benefits Committee of the Company (the 'EBC') to serve as the Plan Administrator and oversee the administration of the Plan.  The Employee Benefits Committee is made up of the Senior Vice President of Human Resources, the Treasurer, the General Counsel, the Controller, and the Vice President of Global Compensation and Benefits."  *See* Hourly 401(k) Plan, p. 2.

109.    Participants may contribute between 1% - 25% of their pay to the Hourly 401(k) Plan.  Hourly 401(k) SPD, p. 4.

110.    "[E]ither the Board of Directors (or any duly authorized committee of the Board) or the Employee Benefits Committee may from time to time amend the Plan."  *See* Hourly 401(k) Plan, p. 14.

---

[4] Upon information and belief, the Benefits Committee named in each separate plan is one and the same; in other words, there is only one Benefits Committee although there are three separate plans at issue here.  Plaintiffs reserve the right to amend their complaint if, through discovery, Plaintiffs' belief proves inaccurate.

111.    The Hourly 401(k) SPD included an exhibit that described the investment options of the Hourly 401(k) Plan, including a description of the Lear Corporation Stock Fund.

112.    In one communication to Hourly 401(k) Plan Participants, Cynthia J. Stolber ("Stolber")[5], Manager, Defined Contribution Plans, represented to the Participants as follows: "The Employee Benefits Committee of Lear Corporation continuously monitors objectives and performance of the Hourly 401(k) Savings Plan funds to provide you with investment options which can best help you meet your retirement planning goals." *See* August 29, 2005 letter to Participants from Cynthia J. Stolber, attached hereto as Exhibit L.

113.    The Trustee of the Hourly 401(k) Plan is Reliance Trust Company. *See* Trust Agreement for Lear Corporation Hourly 401(k) Savings Plan, attached hereto as Exhibit M.

114.    The 2004 Form 11-K described the Hourly 401(K) Savings Plan as:

1.      **Plan Description**

**Eligibility**

All hourly employees at the Auburn Hills and Grand Rapids plants who are covered by a collective bargaining agreement that participates in the Plan are eligible to begin participation on or following completion of 90 days of service.  In June 2004, the Auburn Hills plant was closed therefore those participants no longer contribute to the Plan.  The Auburn Hills participants are still eligible for benefit payments and loans.

**Contributions**

Participants may elect to contribute up to 25% of their annual compensation, subject to certain limitations.   In addition, participants may elect to contribute up to 25% of their annual compensation on an after-tax basis.  The amount of compensation

---

[5] In documents provided to Plaintiffs' counsel to date, Stolber is described as a "Key Person" regarding the Plans.  Plaintiffs will seek leave to add her as a named Defendant if her responsibilities regarding the management and administration of the Plan, or control over the Plans' assets, are revealed to be anything more than purely ministerial.

participants elect to defer through payroll deductions is contributed to the Plan by the Company on their behalf.  Participants eligible to receive payment from the Plan may elect to defer such payment until age 70-1/2.  Plan provisions do not provide for Company contributions.

115.   The following year's Form 11-K (signed by Defendant Jackson) revealed that in December 2005 the Grand Rapids plant was closed and that participants from that plant no longer contribute to the plan but remain eligible for benefit payments and loans.

**D.     Throughout the Relevant Period, the Plans Contained Large Amounts of Lear Corporation Stock**

116.   As of December 31, 2004, the Plans held the following amounts in total assets:

| Portfolio | Total Assets | Lear Share Assets | Lear Shares as% Total Assets |
|---|---|---|---|
| **Salaried RSP** | **$366,860,290.00** | **$74,413,405.00** | **20.28%** |
| **Hourly RSP** | **$217,332,586.00** | **$33,563,997.00** | **15.44%** |
| **Hourly 401(k)** | **$8,258,233.00** | **$427,656.00** | **5.17%** |
| **TOTAL ALL PLANS** | **$592,451,109.00** | **$108,405,058.00** | **18.29%** |

117.   The 2004 Form 11-K represented that for the year ended December 31, 2004, Lear's employees made more than $38 million in contributions to the Salaried RSP; more than $1.2 million to the Hourly RSP; and more than $1 million in contributions to the Hourly 401(k).

118.   As reflected in the chart below, each of the Plans held significant amounts of Lear stock both prior to and during the Class Period.  Unfortunately for the Plans' participants, as the

chart also reflects, each of the Plans lost significant sums of money due to the diminution in the value of Lear stock.

| | **2002** | **2003** | **2004** | **2005** |
|---|---|---|---|---|
| **Hourly:** | | | | |
| Lear Stock Held | $17,551,203 | $32,519,463 | $32,688,609 | $14,415,743 |
| Total Investments | $144,246,799 | $194,578,599 | $214,515,110 | $220,961,533 |
| Lear Stock as a % of Total Investments | 12.17% | 16.71% | 15.24% | 6.52% |
| 12/31 Closing Share Price | $33.28 | $61.33 | $61.01 | $29.34 |
| Number of Shares Held | 527,380 | 530,237 | 535,791 | 492,929 |
| | | | | |
| **Salaried:** | **2002** | **2003** | **2004** | **2005** |
| Lear Stock Held | $42,780,859 | $70,736,656 | $72,176,477 | $30,777,306 |
| Total Investments | $225,473,848 | $316,851,971 | $366,860,290 | $369,173,551 |
| Lear Stock as a % of Total Investments | 18.97% | 22.32% | 19.67% | 8.34% |
| 12/31 Closing Share Price | $33.28 | $61.33 | $61.01 | $29.34 |
| Number of Shares Held | 1,285,483 | 1,153,378 | 1,183,027 | 1,049,079 |
| | | | | |
| **401K Plan:** | **2002** | **2003** | **2004** | **2005** |
| Lear Stock Held | $241,476 | $578,117 | $427,656 | $134,572 |
| Total Investments | $6,389,963 | $8,441,944 | $8,250,974 | $6,546,172 |
| Lear Stock as a % of Total Investments | 3.78% | 6.85% | 5.18% | 2.06% |
| 12/31 Closing Share Price | $33.28 | $61.33 | $61.01 | $29.34 |
| Number of Shares Held | 7,256 | 9,426 | 7,010 | 4,587 |

## DEFENDANTS' FIDUCIARY OBLIGATIONS

119.    ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a).  Below is a list of some of Defendants' fiduciary obligations to the Plans and their participants.

**A.     The Duty Of Loyalty**

120.    ERISA imposes on a plan fiduciary the duty of loyalty -- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . .  for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ."

121.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan sponsor.

**B.    The Duty Of Prudence**

122.    Section 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence -- that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

**C.    The Duty To Inform**

123.    The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

124.    Pursuant to the duty to inform, at all relevant times, fiduciaries of the Plans were required under ERISA to furnish certain information to Participants.  For example, ERISA § 101, 29 U.S.C. § 1021, requires each Plan's Administrator to furnish a Summary Plan Description ("SPD") to Participants.  ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of

fiduciaries under each Plan and in making decisions concerning their benefits and the investment and management of Plan assets allocated to their accounts.

**D.      The Duty To Investigate And Monitor Investment Alternatives**

125.    The duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in each Plan, including employer securities, to ensure that each investment is a suitable option for each Plan.

**E.      The Duty To Monitor Appointed Fiduciaries**

126.    Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.

**F.      The Duty To Disregard Plan Documents**

127.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

## <u>DEFENDANTS WERE FIDUCIARIES OF THE PLAN</u>

128.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1).   A person is a fiduciary if he is designated a "named fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Additionally, to the extent that a person is delegated responsibilities under a Plan or a procedure specified in a Plan, that person is a fiduciary under ERISA. *See* ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

129.     A person can also be a *de facto* fiduciary as a result of the person's authority or control over the plan under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A).  A person or entity is a fiduciary where, by his conduct, he engages in fiduciary activities.  Thus, those who have discretionary authority over administering or managing the Plan or who exercise any authority or control over the Plan's assets are fiduciaries regardless of the labels or duties that the Plan's language assigns to them.

130.     As set forth on the Plan Forms 5500 filed with Department of Labor and the Internal Revenue Service, Lear and its Benefits Committee were the Administrators of the Plans within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1022(16)(A).

131.     Lear was also a fiduciary because it was responsible for disseminating to Participants the Summary Plan Descriptions.

132.     Additionally, Lear was a fiduciary because it was responsible for disseminating to Participants the Plan prospectus (individually and collectively, "Prospectus"), which purported to describe the investment characteristics of Plan investment options.  The Prospectus and all information contained or incorporated in it constitutes a representation disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of each Plan's assets allocated to their accounts.

133.     The Prospectus for each Plan incorporated by reference Lear's SEC filings.

134.     Lear's SEC filings were part of the SPD and the Prospectus.  Lear exercised discretion over the contents of the SPD and the Prospectus it disseminated which were intended to communicate to Participants information necessary for Participants to manage their retirement benefits under each Plan.

135.   Lear was not required to cause the Plans to offer Lear stock as an investment option or to incorporate all of Lear's SEC filings into each Plan's documents, but once it elected to do so, it made the disclosures in those documents in a fiduciary capacity.

136.   Lear was also a fiduciary to the extent that its employees served on each Plan's committee.  Members of the Benefits Committee were Lear employees who served at the pleasure of the Board of Directors.  Based on these facts, Lear had control over the actions of the Benefits Committee and its members and is liable for their actions.

137.   Lear was also a fiduciary during the relevant time period because its Board of Directors was a fiduciary during that time, as alleged below, and the Board is, by definition, an agent of the corporation.

138.   Lear was also a fiduciary because it made direct representations to Participants relating specifically to each Plan's investment options, the business and financial condition of Lear, and the merits of investing each Plan's assets in Lear stock and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement benefits under each Plan.

139.   The Director Defendants were fiduciaries because they were directors of Lear and the Board of Directors was, at all relevant times, responsible for appointing members to committees that were authorized to administer each Plan. The Board had the authority to remove any committee member, with or without cause.  In connection with these responsibilities, the Director Defendants had a duty to appoint persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties and to evaluate the merits of each Plan's investment options.

140.    The Director Defendants had an ongoing duty to ensure that the persons appointed were performing these duties with respect to the selection of investment options and the investment of Plan assets.

141.    Finally, the Director Defendants had a duty to convey information necessary for the appointees to perform their duties.

142.    As a consequence of these duties owed by Lear's Board of Directors, the Board and its members were fiduciaries of each Plan.

143.    Defendants regularly communicated with the Company's employees, including each Plan's participants, about Lear's performance, future financial and business prospects, and about Lear stock.  During the relevant time period, the Company fostered a positive (and/or misleading) attitude toward Lear stock as an investment for each Plan, and/or allowed Plan participants to follow their natural bias towards investing in Lear stock by not fully disclosing material information concerning investing in Lear stock.  As such, Plan Participants (and, upon information and belief, certain Plan fiduciaries) could not appreciate the true risks presented by investments in the Lear stock and therefore could not make informed decisions regarding investments in each Plan.

144.    Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press[6], concerning investment in company stock, including that:

---

[6] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie   Liang   &   Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the*

(a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)     Out of loyalty, employees tend to invest in company stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement processional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

145.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock, they still disseminated materially inaccurate, incomplete and misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

---

*importance of plan design,* Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

## FACTUAL ALLEGATIONS

**A.     Lear Was An Imprudent Investment For The Plans' Assets**

146.     By the inception of the Class Period, Lear stock was no longer an appropriate investment option for the Plans.  In fact, at no time during the relevant period was Lear stock a suitable investment for the Company's employees and retirees.

147.     At this time, Lear was a company with an uncertain future, causing Lear stock to be an extremely risky and highly inappropriate investment for retirement savings.

148.     Unbeknownst to the Plans' participants and investors at large, by the inception of the relevant period and thereafter, Lear was *already* experiencing undisclosed operating and financial problems.   Moreover, the Company's financial problems in connection with its fundamental business problems caused Lear stock to be a wholly inappropriate investment for retirement income savings – the very purpose of the Plans.

149.     Further, as investors ultimately learned, throughout the relevant period, the Company had failed to account for its growing amount of impaired assets, which ultimately topped over $1 billion of impaired assets, inventory and goodwill.  In short, Lear lacked necessary internal financial and operational controls, causing the Company's forecasting of future financial performance to be wildly off base.  The Company suffered from other problems as well, including the fact that (i) the Company was performing far below expectations, and (ii) it was impossible for the Company to meet the near-term earnings, profits and revenue growth projections.

150.     At the heart of the Company's problems was its reliance on a few "key" customers.  As orders from those customers dried up, Lear's profits – and its stock price – fell dramatically.

151.    Exemplifying this, in 2005, GM and Ford represented only a combined 53% of Lear's total revenue, down significantly from 60% only three years earlier.  During this same time, Lear went from posting $13 million in net income in 2002 (down significantly from $274.4 million in net income only two years previously) to a massive $1.38 billion loss in 2005.  Hence, in only five years (2000 to 2005), the Company suffered a $1.65 billion plunge in net income.

**B.      Lear Was Heavily Dependent on Sales to its Largest Customers, Detroit's "Big Three"**

152.    Throughout the Class Period, a disproportionate amount of Lear's sales were to Detroit's "Big Three" -- DaimlerChrysler Corp. ("DCC"), Ford Motor Co. ("Ford") and General Motors Corp. ("GM").

153.    According to the Company's annual report for year ended December 31, 2002, DCC comprised 12% of Lear's net sales, Ford 25% and GM 35%.  By the end of 2005, DCC comprised 11% of Lear's net sales and GM comprised only 28% – sales to Ford were stagnant, remaining at 25%.

154.    Defendants were well aware of Lear's heavy reliance on these three customers. Indeed, financial analysts who had covered the Company for some time repeatedly noted the Company's overdependence on the Big Three.  For instance, analysts at Baird issued a report in January 2004 highlighting the problem and noting that "Sales to the Big Three OEMs accounted for approximately 75% of 2002 revenues. A business disruption or market share losses at these or other major customers could have an adverse effect on revenues and earnings."

155.    In short, as went the Big Three, so went Lear.  Hence, the problems besetting the Big Three such as a loss of market share "pose[d] a degree of risk [to Lear], since they provide over 70% of Lear's revenue." See Prudential Equity Group, LLC report, April 27, 2004.

156.    Indeed, numerous analysts noted the high degree of risk associated with acquiring and holding Lear stock.  For example, Jon Rogers, an analyst at Citigroup/Smith Barney, declared that Lear stock was a "High Risk" due to the fact that approximately 71% of Lear's 2003 revenues were generated by business from the Big Three.  He warned that "[s]ignificant further erosion in Big Three market share **or deterioration in Lear's relationship with these customers** could yield substantial negative effects on revenues and profitability." (Emphasis added).

157.    Further besetting Lear was its business model.  Lear was tethered to "tier two" automotive parts suppliers from which it received the component parts that it used to create the parts it supplies to automotive manufacturers.  In other words, Lear combined component parts from a variety of other manufacturers (the "tier two" suppliers) to produce parts for its principal three customers: Ford, GM and DCC.  Disruption on either end would wreak havoc on Lear's finances.

158.    In its 2002 10-K, the Company stated "it would be difficult and expensive for us to change suppliers of products and services that are critical to our business."  Consequently, when Lear suffered from downward price pressure from the Big Three, it needed its suppliers to lower prices in order to help it recover its diminishing revenue.

159.    On February 28, 2003, Lear entered into a contract ("2003 Contract") with one of its principal customers, DCC.  As explained more fully herein, the 2003 Contract would come to symbolize Lear's demise.

160.    The 2003 Contract called for, in relevant part, a two percent (2%) price reduction of Lear's prices to DCC beginning in earnest in 2005.  This forced price reduction would ultimately come back to haunt Lear.

161.    According to industry analysts, Lear structured its contracts poorly and not in conformity with the industry standard.  In particular, Lear tied its fate to the automakers' overall performance, not to the sales of each vehicle that uses its products (e.g., Lear's seats).

162.    Consequently, as profits for GM and Ford dropped -- due in part to the declining sales of SUVs, which were disproportionately profitable for both the automakers and Lear -- so did Lear's profits.

163.    Comparatively speaking, Johnson Controls Inc., which dominates the automobile seat market with Lear, drafted contracts that were tied to the sale of vehicles using its products. As a result, Johnson Controls Inc. has not suffered the same fate as Lear as consumers turned away from SUVs and towards more fuel-efficient cars.

164.    As fuel prices began to rise, and in reaction to shifting tastes, consumers began to move away from the popular large SUVs of the 90's and towards smaller, more fuel-efficient cars.  In reaction and due to the structure of its contracts, Lear began to suffer financially.

165.    Exacerbating this problem, Lear's suppliers also faced higher production and supply costs which they would then pass onto Lear.  Attempting to offset these circumstances, Lear increased its capital spending, in part, to become a total supplier for their customers.  In short, Lear expended its cash to become a one-stop supplier of interior vehicle components to its customers.

166.    However, and indicative of Lear's problems, while Lear was expending these sums, the intended targets of this new business policy began to turn away from the capital spending alternative of looking for a single component supplier.

## C.     The Effects Of The Industry Downturn On Other Automotive Suppliers

167.    The rampant problems besetting the automotive supply industry became apparent in 2005 when at least four major suppliers filed for bankruptcy protection.  In each instance, the automotive supplier was in a similar position as Lear, overly dependent on a disproportionate few, key automobile manufacturers.

168.    The first major automotive supplier to file for bankruptcy protection was Tower Automotive, Inc. ("Tower"), which filed for Chapter 11 protection on February 2, 2005.  One of the two principal reasons given by Tower executives for this action was the need to "facilitate a debt restructuring" of the company.

169.    Indicative of what lay ahead for automotive suppliers such as Lear, Kathleen Ligocki, the President and CEO of Tower, ominously stated in the company's February 2, 2005 press release that:

> *Like many companies in the automotive sector*, Tower has been affected by *lower production volumes on key auto maker platforms and increased steel prices*.  Additionally, the recent termination of early pay programs at certain auto makers has adversely affected our liquidity.   These factors, combined with a complex and restrictive capital structure and *an unsustainable debt load have made it clear that a financial reorganization was necessary* to resolve these issues.  (emphasis added).

170.    More significantly, Lear's own financial problems began to mount in 2005 as 40 of the Company's suppliers filed for bankruptcy due to, among other things, the rising cost of raw materials.  At least nineteen of Lear's suppliers, citing the *force majeure* clause in their contracts with the Company, asked the bankruptcy court to increase the price Lear pays for its supplies.

171.    As Lear was experiencing these problems from its own suppliers, in early 2005, the Company suffered from downward price pressure from the Big Three[7] and desperately needed its suppliers to lower prices in order to help it recover its diminishing revenue.

172.    The rampant effects of this pricing pressure have recently come to light.  In the Company's most recent annual report, Lear disclosed significantly lower margins on its net sales for each of its three principal divisions: seating, interiors and electronic & electrical.

**D.    By Late 2004, Defendants Were Aware of Lear's Impending Crisis**

173.    Beginning in late October 2004, analysts began to recognize the whirlwind of problems surrounding the Company.   For instance, Citgroup/SmithBarney analyst Rogers reiterated the "High Risk" associated with buying and/or holding Lear common stock.

174.    Merrill Lynch analyst John Casesa in an October 21, 2004 report entitled Lear Corp.: 3Q In-Line But Outlook Weaker," stated that "2005 will be a tough year for the company"….due to "higher raw material costs and more aggressive price demands" from its customers.   Moreover, according to the report, **"several automakers have changed their payment terms, which will hurt reported cash flow".**  (Emphasis added).

175.    The following day, analysts at Morgan Stanley issued a report titled "Lear Corp.: Cloudy Outlook Overwhelms Results."   The report stated that the "company's 4Q outlook was below our expectation" with the Company's problems resulting from "[h]igher raw material costs, volume declines, and potentially negative product mix area [sic] all culprits."   The report again noted Lear's overdependence on an extremely limited customer base, stating Lear's future financial results were "highly dependent upon Ford and GM production."

---

[7] In April 2005, GM's shares fell to a 10 year low, due in part to GM's report of a $1.1 billion loss for the first quarter.  The following month, Standard & Poor's Rating Service cut GM

176.   On November 11, 2004, Citigroup Smith Barney analyst Jon Rogers issued reports on GM and Ford, which both stated: **"U.S. auto manufacturers are not 'buy and hold' stocks.** Brutal competition in the global vehicle market, legacy liabilities, and over capacity in the industry prevents us from recommending a long-term buy-and-hold approach to automaker shares." (Emphasis added).

177.   Unfortunately for the Plans' Participants, analysts punished Lear for its excessive dependence on the Big Three; in other words, if any one of the Big Three committed a miscue, Lear would suffer.   For instance, in June 2005, Deutsche Bank analysts lowered earnings estimates for Lear, citing "lower Ford volumes, and our anticipation of costs associated with struggling suppliers..."

**E.      Lear's Problems With DCC**

178.   In January 2005, Lear requested that DCC voluntarily withhold processing the price reduction agreed upon in the 2003 Contract.  DCC agreed to not implement the 2% price reduction.  However, according to papers later filed by DCC, Lear made no attempt to resolve the 2003 Contract dispute with DCC.   Consequently, DCC imposed the 2% price reduction in September 2005.

179.   By the fall of 2005, Lear could not afford to pay its own suppliers due to the rising price increase its suppliers were charging.  On October 31, 2005, Lear informed DCC that it had received letters from its suppliers demanding higher prices, citing the *force majuere* clause in the contracts between Lear and its suppliers.

180.   On November 21, 2005, David Wajsgras wrote DCC and personally informed DCC that Lear could not pay two of its suppliers – Shawmut Mills and Sandusky Vinyl, both

and Ford's credit ratings to junk status.

makers of key components of roof headliners and door trim panels -- unless DCC agreed to pay higher prices. In reaction to this disclosure, DCC filed a lawsuit against Lear. Interestingly, unlike the contracts between Lear and its suppliers, the contract between Lear and DCC did not contain a force majeure clause.

181. On December 2, 2005, the judge presiding over the matter ordered Lear to continue supplying parts to DCC.

182. The magnitude of the problems facing Lear, and the potential impact of Lear's dispute with DCC was summed up succinctly by Lehman Brothers analyst Darren Kimball in his December 1, 2005, report entitled: Lear Corp.: Chrysler Dispute Suggests Tough Times. In the report, Kimball noted that "Just to be in this situation suggests an unfavorable outcome to some degree. If Lear succeeds in winning the battle over near term economics, it may ultimately lose the war if Chrysler banishes the company to its 'no-bid' list."

183. Evincing Lear's worsening problems, in December 2005, DCC awarded the contract to supply the interior to the next-generation of DCC's Ram pickup trucks to Johnson Controls and Visteon Corp. The contract was estimated to be worth about $400 million a year and Lear, who supplies the current Ram pickup, was counting on the contract to help bring the Company out of financial peril.

**F.    Lear's Business Collapses**

184. A major crisis in the automotive supply industry became apparent to Defendants in 2005 when at least four major suppliers -- Delphi Corp., Visteon Corp., Tower Automotive Inc., and Collins & Aikman Corp. -- filed for bankruptcy protection. Each, like Lear, was overly dependent on a few, key automobile manufacturers.

185.    In February 2005 Lear was plagued by a number of serious problems that were impairing its business, including that it was unable to pay its suppliers, it was facing significant pricing pressure from its major customers, it had lost significant contracts to competitors and had more than $1 billion of impaired assets on its books that it needed to write down.

186.    Further, the Company was experiencing growing cost pressure from its suppliers. As a result, the Company's financial guidance going forward was lowered.  For instance, in a March 1, 2005 press release, the Company stated that it would only "breakeven" for the quarter due to "additional industry production cuts, largely in North America" and that the Company was "experiencing continuing cost pressures from its supply base."

187.    In short, the Company's financial outlook was bleak and there was no end in sight to the Company's financial woes.

188.    On April 22, 2005, the Company again issued disappointing financial results.  In pertinent part, the press release stated:

> For the first quarter of 2005, Lear posted net sales of $4.3 billion and net income of $15.6 million, or $0.23 per share, including a one-time tax benefit of $0.26 per share resulting from a tax law change in Poland. These results compare to net sales of $4.5 billion and net income of $91.4 million, or $1.24 per share, for the first quarter of 2004.

189.    Indicative of the Company's financial plight, had there not been a tax law change in Poland, the Company would have lost $0.03 per share.  The press release claimed that the decrease in net sales from the previous year resulted primarily from an "unfavorable vehicle platform mix in North America, as well as lower industry production in Lear's major markets" and that "[n]et income per share in the quarter declined from the year earlier results."

190.    On July 29, 2005, Lear released results for the second quarter, with the Company reporting a loss of $0.66 per share.   Although these results were disappointing, Defendant Rossiter remained outwardly upbeat stating that "Despite the tough operating environment, the Lear team remains focused on delivering superior quality and service to our customers, ensuring that key new products are launched flawlessly and taking aggressive steps to improve our competitiveness going forward."

191.    On October 26, 2005, the Company issued a press release announcing Lear's third quarter financial results.   Incredibly, despite reporting a net loss for the quarter of $11.17 per share, Defendants continued to report guidance for fourth quarter 2005 as high as earnings of $0.75 per share.   Acknowledging the myriad of problems besieging the Company, the press release stated that "Given this level of uncertainty, Lear does not intend to provide formal financial guidance for the fourth quarter of 2005.   However, on a directional basis, the Company expects net income in excess of $0.75 per share, excluding planned restructuring costs of approximately $0.50 per share in the quarter, and positive free cash flow."

192.    In other words, the Company wanted shareholders, including the Plans' Participants, to believe that the Company's financial woes were behind it and the future was bright.

193.    Despite the Company's financial problems and any lack of evidence of a turnaround, Defendants caused the Plan to hold more than $100 million of Lear stock and to purchase more shares of Lear stock even as certain Defendants began selling their own personal holdings of Lear shares.

**G.    Lear Receives Government Subpoenas**

194.    On March 9, 2006, after the market had closed, the Company announced that it had received a subpoena from the SEC regarding payments and credits made to GM dating back to 2001.  In October of the previous year, GM disclosed that the SEC was investigating "GM's recovery of recall costs from suppliers and supplier price reductions or credits."

195.    According to media reports at that time, Lear had then disclosed in its annual report that it had received a subpoena from the U.S. Securities and Exchange Commission, at least one month prior, that sought information related to General Motors Corp.'s accounting for supplier payments and credits.   Lear said the SEC was seeking documents related to payments or credits to GM from 2001 to the present.

196.    GM had previously stated in October 2005, that it was subpoenaed by the SEC for documents relating to Delphi Corp., its former parts division and major supplier.  At that time, GM also said the SEC wanted information about GM's recovery of recall costs from suppliers, and supplier price reductions or credits.

**H.    The Company's Costly Restructuring Efforts**

197.    Attempting to stem the tide of financial problems facing the Company, Lear announced on June 27, 2005 a two year restructuring program.  The restructuring plan included the elimination of 7,700 jobs, out-sourcing work to other countries, and taking a charge of up to $250 million.

198.    The Company's restructuring announcement received, at best, mixed reviews from Wall Street analysts.

199.    In a June 27, 2005, note following the announcement of Lear's restructuring, Deutsche Bank analyst Rod Lache stated "The fact that Lear is restructuring should not come as a

surprise. However, **the magnitude of the restructuring cost is considerably higher** than . . . expected…. GM and Ford downsizing remains a significant risk…We remain concerned about the potential for additional earnings headwinds related to future GM and Ford downsizing. Future closures of GM and Ford assembly plans will likely necessitate additional restructuring actions by Lear." (Emphasis added).

200.   On July 29, 2005, Merrill Lynch analyst John Casesa stated bluntly that "[I]t's hard for us to see why the stock should continue to do well as **the company faces the enormous challenges** of restructuring its current business model and investing to build a new one." (Emphasis added).

201.   Further, analysts have expressed dismay over the Company's lack of a cohesive explanation as to why the Company's financial fortunes evaporated.  For example, in August 2005, Deutsche Bank analyst Rod Lache stated "**Lear has been uncharacteristically vague about the factors that led to the dramatic deterioration they experienced during the first 9 months of this year, and they have not addressed questions relating to expectations for 2006**." (Emphasis added).  His report went on to state that "Lear remains tied to declining customers and segments. Lear is still overwhelmingly tied to Big Three, and light truck/SUV production…Moreover, we have [sic] believe that GM and Ford are about to embark on significant changes to their capacity and marketing strategies that will result in meaningfully lower volume for supplier over time…."

202.   In short, the Company's restructuring efforts had failed to address the Company's key problem, excessive reliance on only a few customers.

203.   Moreover, the Company's restructuring efforts have been questioned as of late due to the exodus of senior management at the Company.

204.    On February 22, 2006, with little or no explanation, the Company's then CFO, Defendant Wajsgras, announced his retirement effective March 10, 2006.  At the time investors were told only that Defendant Rossiter was "disappointed over [defendant Wajsgras'] departure," and that Wajsgras had taken a job at Raytheon, a competitor of the Company.

205.    Importantly, Mr. Wajsgras was leading the negotiations with a New York-based private equity firm regarding the joint acquisition by Lear and the equity firm of all or part of Collins & Aikman Corp.  Defendant Vandenberghe assumed the role of interim CFO.  A week after Mr. Wajsgras's announcement, Lear's Vice President of Corporate Development left the Company.

206.    Further exemplifying the Company's dire predicament, in its most recent annual report, Lear acknowledged that it was trying to shed some of its business when it announced that it was looking into "strategic alternatives" to its interior segment.

## I.    The Company's Burgeoning Debt Load

207.    Due to the Company's restructuring efforts, one supplier strategy, and declining profits, Lear began to take on an increasing amount of debt during the Class Period.  The first round of these debt repayments included a $700 million dollar payment in 2007.

208.    Indicative of the Company's burgeoning debt load, according to the Company's most recent annual report, the Company's long-term debt ballooned from less than $1.87 billion in 2004 to over $2.24 billion in 2005.

209.    Analysts, fearful of the Lear's burgeoning debt load, repeatedly noted that Lear should pay down its debt while it was in a financial position to do so.

210.    For instance, according to a March 15, 2006 Wall Street Journal article, Rich Pzena – manager of a $20 billion money-management firm that owns nearly 10 million shares of

Lear stock -- suggested to Lear that it refinance its debt in October 2005. When Mr. Pzena first made the suggestion, Lear stock was trading over $30 per share. It now is worth only a fraction of that amount and the Company must contend with a junk bond rating.

211.   Further, it has been recently revealed that Lear may violate loan agreements. To militate against this possibility, it has been widely speculated that Lear may be a "forced seller" of its assets. While selling assets will help raise capital, being a forced seller means you rarely sell the asset for its true worth.

**J.   The Company's Declining Credit Rating**

212.   Further causing the Company financial stress is its declining credit rating, causing any restructuring efforts to cost more and financing for such efforts to be harder to obtain, and mounting impairment of assets. Unfortunately for the Plans' Participants, neither has been a recent, unexpected occurrence.

213.   In July 2005 Moody's Investors Service changed its credit rating of Lear's senior unsecured debt from Baa3 to Ba2 (judged to have speculative elements and subject to substantial credit risk). Also in July 2005, Fitch Ratings moved its ratings outlook for Lear from stable to negative.

214.   In August 2005, Standard & Poor's Ratings Services changed its credit rating of Lear's senior unsecured debt from BBB- to BB+ and maintained its rating outlook at negative.

215.   On October 20, 2005, Participants of the Plans learned that the need for additional goodwill and asset impairment charges would far exceed those previously disclosed by Defendants, and that Defendants then estimated the charges to run at least as high as $670 million.

216.   During 2005 Lear recognized $82.3 million of fixed asset impairment charges, $104.4 million of restructuring and related manufacturing inefficiency charges (including $15.1 million of fixed asset impairment charges), $39.2 million of litigation-related charges, $46.7 million of charges related to the divestiture and/or capital restructuring of joint ventures, and $300.3 million of tax charges.

217.   In the fourth quarter 2005 the Company concluded that it was no longer more likely than not that it would realize its U.S. deferred tax assets and recorded a tax charge of $300.3 million comprised of (i) a full valuation allowance of $255.0 million and (ii) an increase in related tax reserves of $45.3 million.

218.   On January 6, 2006, Fitch Ratings downgraded Lear from BBB- to BB+ "reflect[ing] Fitch's concerns regarding limited free cash flow generation due to a weakened operating profile, which increases the potential for further balance sheet deterioration in the near-term." Fitch specifically noted "the Ford Explorer, General Motors' (GM) truck based SUVs, and the Dodge Durango—some of Lear's highest contented vehicles—all saw production declines in excess of 30% in 2005."

219.   On January 11, 2006, the Plans' participants along with investors at large again learned that Lear would have to take additional, massive charges when Defendants announced that Lear would record an additional $342 million in write-downs in fourth quarter 2005 related to impairments in Lear's automotive interiors unit.   Defendants claimed that the additional charges related to goodwill impairment charges that resulted from a worsening business outlook.

220.   On March 8, 2006, investors learned of further control and procedural deficiencies at the company when Defendants reported that Lear had suddenly recorded a $6 million "adjustment" that had the effect of further reducing the beleaguered Company's 2005 financial

results. According to Defendants, subsequent to the Company's original earnings announcement on January 25, 2006, Lear had been advised by a major customer of "retroactive pricing adjustments" associated with a particular vehicle program for shipments made prior to 2006. Certain payments due to Lear in 2006 were withheld as a result of these pricing adjustments. According to Defendants, these adjustments would impact diluted net loss per share by $0.09 for both the fourth quarter and full year.

221.   On March 9, 2006, Defendants issued their Annual Report for year ended December 31, 2005, and reported their fourth quarter 2005 results. Lear reported a charge of $423 million for restructuring and impairment activities and reported a quarterly loss of $596.6 million – or a loss of $8.88 per share. For full year 2005, Defendants reported a loss of $1.38 billion – or a total yearly loss of $20.48 per share—compared to their full-year guidance issued in January 2005 of $5.00 to $6.00 a share.

222.   On March 21, 2006, Moody Investors Service lowered Lear's debt rating to "junk" status because of the Company's cash flow constraints and large debt obligations. At that time, Moody's reported that these conditions were likely to cause Lear to rely more heavily on its $1.7 billion line of credit. Moody's also noted that in February 2007, Lear would face up to $717 million of debt payments from the maturity of its $400 million bank term loan. Moody's also highlighted the weakness of Lear's then current financial position, stating that, "the Company's modest free-cash-flow generation and sizable debt maturities will result in greater reliance on external liquidity."

223.   On March 29, 2006, Standard & Poor's ("S&P") cut its rating on Lear's debt five notches deeper to junk, citing a sharp deterioration in Lear's operating performance in 2005.

According to S&P, the downgrade also reflected expectations that Lear's earnings and cash flow generation for the next few years would remain below what was previously expected.

224.    S&P also cut Lear's senior unsecured debt five steps to "B-minus", six levels below investment grade, and its corporate credit rating was cut three notches to "B-plus", four levels below investment grade, from "BB-plus." S&P also then stated that any improvement in 2005 would be "modest, and that Lear's earnings and **cash flow will remain depressed in the near term**." (Emphasis added).

225.    On that same day, March 29, 2006, the Defendants announced that the Company had suspended payment of its dividend and had reduced the Company's revenue base by selling Lear's interior auto parts division. Defendants also revealed that Lear was also required to substantially increase its debt load by obtaining an additional $800 million in loan facilities to sustain then current operations, and to augment Lear's generation of free cash flow.

**K.     Throughout The Class Period, Financial Analysts Rated Lear Stock As a "High Risk" Investment and Warned of Financial Troubles**

226.    Since the inception of the Class Period, at least 22 separate analysts reports were issued rating Lear's stock risk as "High."   Consequently, while not all Defendants may have known of the true extent of the Company's peril, even a cursory review of the Company's analysts and market performance would have raised a serious "ref flag" regarding the prudence of investing in Lear stock.

227.    Indeed, the Company's stock has been downgraded at least 17 times and labeled with a "sell" rating on at least five separate occasions. Moreover, the credit ratings agency Fitch has dropped the Company's debt rating deep into junk status.  Correspondingly, Fitch is now advising investors as to what percentage of their investment they will recover if the Company

files for Chapter 11 bankruptcy protection; a clear sign that the ratings agency questions the viability of Lear.

228.    In an April 25, 2005 report, Merrill Lynch analyst John Casesa stated: "We are lowering rating [from Buy to Neutral] and estimates on deteriorating fundamentals and negative secular trend in company's earnings power.... a combination of secular factors lead us to conclude that Lear's earnings power will remain under pressure for the foreseeable future: 1) Lear is a big company in the largely outsourced interiors segment, meaning that its growth rate is inevitably slowing; 2) declining Detroit market share, particularly at GM, will continue to overwhelm, or at best, partially offset the impressive gains Lear is making with non-Detroit customers; 3) rising capital expenditures will take a big bite out of historically strong cash flow; and 4) we expect Lear to incur considerable cash costs to restructure its business."

229.    In an April 25, 2005, report, titled "Mix Devastation" Credit Suisse/First Boston analyst Christopher Ceraso stated "Lear's first quarter operating loss...was representative of the devastating mix effect of steep production declines on bread-and-butter models such as the GMT800 SUVs, Ford Explorer, and Dodge Ram....There is little relief in sight for Lear, as further production declines on those very platforms are expected again ....We would **expect the stock to go lower** before going higher...." (Emphasis added).

230.    On October 26, 2005, Citigroup analyst Jon Rogers reiterated Lear's Sell rating, stating succinctly: "**Turnaround depends on factors beyond management's control**...." (Emphasis added).

231.    Also on October 26, 2005, Deutsche Bank analyst Rod Lache titled his report "Hoping for Divine Intervention," and stated "**we remain concerned that Lear faces overwhelming challenges....** Further declines to North American production could lead to

additional distress among tier-two suppliers. Negative mix and raw material cost trends are also likely to remain headwinds." (Emphasis added).

232.    On October 27, 2005, Morgan Stanley analyst Jonathan Steinmetz concluded, "we are **not yet ready to recommend this stock** based upon earnings potential, given the company's free cash flow usage, the poor relative performance versus JCI's interior segment (which makes us wonder about the relative cost structures), and the lack of a clear path to a return to anywhere close to historical margins." (Emphasis added).

233.    On July 31, 2006, Joseph Amaturo of Calyon Securities reiterated his "Sell" rating for Lear due to the lack of progress in Lear's turnaround efforts, despite the Company's massive restructuring efforts.   Ominously, he asserted that "Lear's fundamentals remain weak" and expected further deterioration "given the challenging automotive environment in which the company operates."

234.    Amaturo's report concluded "[w]e would be **aggressively selling shares at current levels**." (Emphasis added).

235.    Despite these frank reports from industry analysts, and with the Company hemorrhaging hundreds of millions of dollars, Defendant-fiduciaries took no action to protect the Plans and, concomitantly, their Participants from the mounting losses until well into the Class Period.   Such action was too little and was far too late to ameliorate the Plans' losses as Lear stock – by the Company's own investment calculator (available at www.lear.com) – lost over 59% of its value since the start of the Class Period.

**L.     Defendants Knew or Should Have Known That Lear Stock Was Not A Prudent Plan Investment**

236.    At all relevant times, Defendants knew or should have known that Lear, like many of its contemporaries, was facing fundamental troubles described above, on top of the not fully disclosed Lear-specific contractual and other problems, which made Lear Stock an imprudent Plan investment.

237.    Defendants failed to properly to take into account the numerous practices that put Lear stock at risk, as well as the fact that Lear stock was a questionable retirement vehicle when determining the prudence of investing and holding Plan assets in Lear Stock.

238.    Moreover, during the Class Period, there were numerous "red flags" which would have alerted a prudent fiduciary of the questionable nature of investing retirement assets in Lear stock.  For example, during the Class Period, at least four of Lear's competitors filed for bankruptcy.  These companies included Delphi Corp., Visteon Corp., Tower Automotive Inc., and Collins & Aikman Corp.

239.    Further, and as demonstrated by the graph below, even a cursory comparison of the Company's performance to that of the automotive index, S&P 500, or even the Dow Jones industrial average for that matter, would have revealed Lear's significant underperformance.



240.   Indeed, in the Company's most recent proxy statement, submitted to the SEC as Form DEF 14A, the Company acknowledged that it has underperformed its peer group consisting of ArvinMeritor, Inc., Borg-Warner Automotive, Inc., Collins & Aikman Corporation, Dana Corporation, Delphi Corporation, Eaton Corp., Gentex Corp., Johnson Controls, Inc., Magna International, Inc., Superior Industries International, Tower Automotive and Visteon Corporation since early 2004.   The disparity between Lear and its peer group would have been even greater but for the fact that a number of the companies listed in the peer group had filed for bankruptcy.

241.   Another indication of the Company's financial predicament was its complete inability to meet its own earnings forecast.   For instance, as demonstrated by the chart below the Company fell significantly below its earnings forecast for each quarter in 2005:

**Lear Corporation Quarterly EPS Estimates vs. Actual**

| Period | Estimate | Actual | $ Difference | % Difference |
|---|---|---|---|---|
| 2005: | | | | |
| Q1 | $.50 to $.70 | $0.23 | ($.27) to ($.47) | -54% to -67% |
| Q2 | $.20 to $.40 | ($0.66) | ($.86) to ($1.06) | -430% to -530% |
| Q3 | $.70 to $.90 | ($11.17) | ($10.47) to ($10.27) | -1496% to -1141% |
| Q4 | $0.75 | 1 ($3.87) | ($4.62) | -616.00% |

**Note:**

**1.     Lear did not give "formal" guidance but gave "directional" guidance for the 4th quarter 2005.**
**Guidance excluded impairment charges.**

242.    Further, Lear stock lost over 52% of its value in 2005 and has lost more than 27.97% of its value to date in 2006.

243.    During 2005, the Company has seen its revenue from its three principal customers fall.  For instance, in 2005, GM and Ford represented a combined 53% of Lear's total revenue, down from 60% in 2002.  In addition, as its performance was tied to that of Detroit's Big Three, it would have invariably been aware that Ford and GM both reported an approximate 5% drop in sales in 2005, with their big ticket items such as the Cadillac Escalade and Ford Explorer – both of which use a number of Lear products – suffering declining sales of 20% each in 2005.

244.    Defendants failed to conduct an appropriate investigation into whether the Lear Stock Fund was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding Lear's true financial health, such that other Plan fiduciaries and the Plan participants could make informed decisions regarding the Company Stock Fund in the Plan, and otherwise failed to protect the Plan and its participants against inevitable losses.

245.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in the Company Stock Fund, under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

246.    Because Defendants knew or should have known that the Lear Stock Fund was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their Participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in the Lear Stock Fund.

247.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of Lear stock; discontinuing investment contributions in the Lear Stock Fund; discontinuing Company matching contributions at a date earlier than they actually did; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; or resigning as the Plans' fiduciaries to the extent that as a result of their employment by Lear they could not loyally serve the Plans' participants in connection with the Plans' acquisition and holding of Lear stock.

## M.    Defendants Regularly Communicated With Plan Participants

248.    Defendants regularly communicated with the Company's employees, including the Plans' participants, about Lear's performance, future financial and business prospects, and about Lear Stock Fund, one of the largest single assets in the Plans.

249.    During the relevant time period, the Company fostered a positive (and/or misleading) attitude toward Lear stock as a Plan investment, and/or allowed the Plans' participants to follow their natural bias towards investing in Lear stock by not fully disclosing material information concerning investment in Lear stock.

250.    For instance, on November 9, 2005, the Employee Benefits Committee sent a memo to employees regarding the new limitations on contributions to the Lear Stock Fund. The memo stated that starting on December 1, 2005 new investments in the Lear Stock Fund would

be limited to a maximum rate of 15%. The Committee's memo encouraged employees to reallocate anything over 15% in the Lear Stock Fund to other Retirement Savings Plan funds, but stated it was not requiring employees to reallocate their assets. Notably absent from this memo, however, was any mention of the depth of the financial crisis that had beset the Company.

251. As such, the Plans' Participants (and, upon formation and belief, certain of the Plans' fiduciaries) could not appreciate the true risks presented by investments in the Lear stock and therefore could not make informed decisions regarding investments in the Plans.

**N.   Defendants Suffered From Conflicts Of Interest**

252. Lear's financial filings, including annual reports, during the Class Period make clear that a significant percentage of corporate Director and Executive Officer compensation is in the form of stock grants, stock option grants, and/or bonuses based, at least in part, on the performance of Lear common stock.

253. Thus, it was in Defendants' best interests to keep the Plans – large holders of Lear stock – invested in the Company's common stock. Had the Plans divested themselves of their holdings in Lear stock, this would have invariably sent a negative signal to the market in general, thereby lowering the price for Lear stock and lowering the overall compensation for Defendants to the extent that such compensation was based on the performance of Lear common stock.

254. Moreover, while the Company and Defendants were fervently trying to obfuscate the magnitude of the Company's financial crisis, at least some of the individual Defendants engaged in significant sales of their personal holdings of Lear stock.

255. Indeed, the stock sales of Defendants Rossiter, Vandenberghe, Wajsgras, and Jackson on the open market alone totaled over $5 million. Many of these Defendants had little or no other activity regarding their holdings of Lear stock during this time. Further, the $5 million

in stock sales does not include these Defendants' disposition of Company stock on the non-open market.

256.    Because, upon information and belief, the compensation of the Defendants was tied to the price of Lear stock, Defendants had the incentive to keep the Plans' assets heavily invested in Lear stock. Elimination of the Plans' holdings of Company stock would have flooded the market with Lear stock, thereby lowering demand for Lear stock and sending a negative signal to Wall Street analysts, which in turn would have adversely affected the price of Lear stock, resulting in lower compensation for the Defendants.

257.    Some Defendants may have had no choice in tying their compensation to Lear securities (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plans' participants' and beneficiaries' retirement savings tied up to a large extent in Lear stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

258.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders and the interests of the Plans' participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

## CLAIMS FOR RELIEF UNDER ERISA

259.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

260.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

261.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

262.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

263.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Lear stock, to ensure that each investment is a suitable option for the plan;

(b)     A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye

single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

    (c)    A duty to disclose and inform, which encompasses:

    (d)    (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

264.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

265.    Plaintiff therefore brings this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants.

## CAUSATION

266.    The Plans suffered at least tens of millions of dollars in losses because substantial assets of the Plans were imprudently allowed to be put at great risk by Defendants, through the Plans' asset investment in Lear stock during the Class Period, in breach of Defendants' fiduciary

duties. This loss is reflected in the diminished value of the Plan Trust during the Class Period and resulting diminished account balances of the Plans' Participants.

267.   Defendants are responsible for losses caused by participant direction of investment in Lear stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Lear stock, and Defendants remain liable under ERISA for losses caused by such investment.

268.   Defendants are also responsible for all losses caused by the investment of the Plans' Company matching contributions in Lear stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

269.   Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Lear stock, eliminating Lear stock as an investment alternative when it became imprudent, and divesting the Plans from Lear stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that it suffered through its continued investment in Lear stock.

## SECTION 404(c) DEFENSE INAPPLICABLE

270.    The Plans suffered a loss, and Plaintiffs and the other Class members suffered losses, because substantial assets in the Plans were invested in Lear Stock during the Class Period in violation of the Defendants' fiduciary duties.

271.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period unless participants in the Plans themselves exercised effective and informed control over the assets in the Plans in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

272.    Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, the Defendants did exactly the opposite.  As a consequence, Participants in the Plans did not have informed control over the Plans' assets that were invested in Lear stock, and the Defendants remained entirely responsible for ensuring that such investments were and remained prudent.

273.    The Defendants' liability to Plaintiffs for relief stemming from imprudent the Plans' investments in Lear Stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

274.    As Lear stock lost a significant amount of its value, the Plans suffered devastating losses.  Thousands of Participants lost a substantial portion of their retirement savings. Defendants are liable for those losses which were caused by their breaches of fiduciary duty.

## COUNT ONE

### Failure to Prudently and Loyally Manage Plan Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 against all Defendants)

275.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

276.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

277.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company stock.

278.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in Lear stock in the Plan were prudent, and are liable for losses incurred as a result of such investments being imprudent.

279.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan (e.g. plan trustees) to do so.

280.   To the contrary, Defendants failed to act in the best interest of the Plans and concomitantly the Class members.

281.   The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period the Defendants knew or should have known that Lear stock was not a suitable and appropriate investment for the Plan as described herein. Nonetheless, during the Class Period, these fiduciaries continued to offer the Lear Stock as an investment option for the Plan and to direct and approve the investment of Lear stock, instead of cash or other investments. Similarly, during the Class Period, these fiduciaries continued to provide Company matching contributions in Lear stock, instead of in a prudent retirement investment. In so doing, Defendants further breached their fiduciary duties. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Lear stock and the Company matching contribution in the form of Lear stock. In addition, given that such a high concentration of the assets of the Plan were concentrated in the stock of a single company, Lear, Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All of them failed to implement any such strategy.

282.   The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

283.   The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, or knowingly undertaking to conceal the failure to prudently

and loyally manage Plan assets in exercising their discretion with respect to offering Company stock as an investment option in the Plan and providing the Company matching contributions in Lear stock, despite knowing that such failure was a breach; enabling the Defendants to fail to prudently manage Plan assets in exercising discretion with respect to Plan investments, including the match as a result of their own fiduciary breaches; and by having knowledge of the failure to prudently manage the Plan assets, yet not making any effort to remedy the breach.

284.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

285.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT TWO

### Failure to Monitor the Individual Defendants and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Lear and Director Defendants)

286.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

287.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

288.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Lear and Director Defendants included the responsibility to monitor other fiduciaries, including the Benefits Committee.

289.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (the Benefits Committee).    In this case, that meant that the monitoring fiduciaries, including Lear, had the duty to:

      a.    Ensure that the Benefits Committee possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

      b.    Ensure that the Benefits Committee are provided with adequate financial resources to do their job;

      c.    Ensure that the Benefits Committee have adequate information to do their job of overseeing the Plan investments;

      d.    Ensure that the Benefits Committee have ready access to outside, impartial advisors when needed;

      e.    Ensure that the Benefits Committee maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

      f.    Ensure that the Benefits Committee report regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

290.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.   In addition, a monitoring fiduciary must provide the monitored fiduciaries with

complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

291.    Lear and Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund.  Lear and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering the Lear stock as a Plan investment, and continuing to invest in Lear stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

292.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, Lear and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the individual Defendants accurate information about the financial condition and practices of Lear that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

293.    Lear and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the Defendants; by enabling the breaches by

these Defendants; and by having knowledge of these breaches yet not making any effort to remedy the breaches.

294.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

295.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Provide Complete and Accurate Information
### To Plan Participants and Beneficiaries
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)

296.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

297.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

298.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

299.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or

concealing material information, regarding investment options under the Plans such that participants can make informed decisions with regard to the prudence of investing in such options. This duty applies to all of the Plans' investment options, including investment in Lear stock.

300.    Because investments in the Plans were not diversified (i.e. the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested, so heavily in Lear stock), such investment carried with it an inherently high degree of risk.   This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Lear stock.

301.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Lear's stock, the Company's operations and risks, the magnitude and implications of the perils facing the Company, and the consequent higher degree of risk in investing in Lear stock then investment in Lear stock prior to these problems arising, and, generally, by conveying inaccurate information regarding the soundness of Lear stock and the prudence of investing retirement contributions in Lear equity.  This information was necessary for Participants in the Plans to accurately assess the quality of an investment in Lear securities.

302.    These failures were particularly devastating to the Plans and their Participants as a heavy percentage of the Plans' assets were invested in Lear stock during the Class Period.  Thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

303.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Lear stock, despite knowing of their

breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

304.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally inaccurate, incomplete, and materially misleading concerning the prudence of investments in Lear stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Lear stock during the Class Period.  Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

305.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

306.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

307.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### of ERISA by All Defendants)

308.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

309.   At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

310.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

311.   Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Lear common stock; failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made Lear stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, failing to do so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company above the interests of the participants with respect to the Plans' investment in Lear stock.

312.   Further, as noted above, at least some Defendants demonstrated their breach of duty of loyalty by selling significant amounts of their personal holdings of Lear stock during the

Class Period, despite taking no significant remedial measures to protect the Plans' participants from the Plans' imprudent investment in Lear stock.

313.    As a consequence of the Defendants' breaches of fiduciary duty, the Plans suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

314.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a)(2), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plans' recoveries to the accounts of all Participants who had any portion of their account balances invested in Lear stock, maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price of Lear stock;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

J.      Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby request a jury on all issues so triable.

Dated September 20, 2006

**STEPHEN F. WASINGER PLC**

By:     *s/Stephen Wasinger*
          Stephen Wasinger (P25963)
          300 Balmoral Centre
          32121 Woodward Avenue
          Royal Oak, MI 48073
          Tel: (248) 554-6306
          Fax: (248) 479-0391
          sfw@sfwlaw.com

*Liaison Counsel for Plaintiffs*

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer
Gerald D. Wells, III
280 King of Prussia Road
Radnor, PA 19087

*Lead Counsel for Plaintiffs*

**MOTLEY RICE, LLC**
Stuart J. Guber
David J. Worley
One Georgia Center
600 W. Peachtree St., Suite 800
Atlanta, GA 30308

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
32 East 57th Street, 12th Floor
New York, NY 10022

**LAW OFFICE OF ALFRED G. YATES JR PC**
Alfred G. Yates Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Eric T. McCormick, Thomas G. McNeill and Cardelle B. Spangler, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:

> Stephen J. Fearon, Jr.
> Squitieri and Fearon
> 32 E. 57th Street
> 12th Floor
> New York, NY 10022
>
> Gerald L. Rutledge
> Alfred G. Yates, Jr. Assoc.
> 429 Forbes Avenue
> 519 Allegheny Building
> Pittsburgh, PA 15219
>
> Alfred G. Yates, Jr.
> Alfred G. Yates, Jr. Assoc.
> 429 Forbes Avenue
> 519 Allegheny Building
> Pittsburgh, PA 15219

                              *s/Christine Coon*
                              STEPHEN F. WASINGER PLC
                              300 Balmoral Centre
                              32121 Woodward Avenue
                              Royal Oak, MI 48073-0999
                              Tel:  (248) 554-6300
                              Fax:  (248) 554-9400
                              ccoon@kickhamhanley.com

KH085841;2